8

UNITED STATES DISTRICT COURT

9

FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11
GREGORY MINER,

No.  2:17-cv-1896-MCE-EFB P

12
Plaintiff,

13
v.

<u>FINDINGS AND RECOMMENDATIONS</u>

14
W. DAVID SMILEY, et al.,

15
Defendants.

16

17
Plaintiff is a state prisoner proceeding without counsel in an action brought pursuant to 42

18
U.S.C. § 1983.  Defendants move for summary judgment.  ECF No. 29.  For the reasons that

19
follow, the motion must be granted.

20
**I.      The Complaint**

21
Following screening under 28 U.S.C. § 1915A (ECF No. 8), two claims remain in this

22
action: (1) for deliberate indifference to serious medical needs in violation of the Eighth

23
Amendment, against Rudas, a doctor at Mule Creek State Prison ("MCSP"), and (2) for

24
retaliation in violation of the First Amendment, against Vaughn, also a doctor at MCSP.  ECF No.

25
1 at 5-7.

26
Plaintiff alleges that he suffers from rheumatoid arthritis, for which he took a "biologic,"

27
immune-suppressing medication.  *Id.* at 5.  On September 29, 2016, he was seen by defendant

28
Rudas for excessive swelling in his right knee.  *Id.*  Rudas told plaintiff he would insert a needle

into the joint "to remove some fluids for cultures" and then inject a steroid. *Id.* Plaintiff told Rudas that his biologic medication had not been stopped, but Rudas went ahead with the procedure without first consulting plaintiff's rheumatologist. *Id.* The fluid culture came back negative. *Id.* But plaintiff subsequently developed a Methicillin-resistant Staphylococcus aureus ("MRSA") bacterial infection in the knee that required hospitalization. *Id.* at 5-6. According to plaintiff, the initial negative culture shows that the MRSA was introduced to the knee during Rudas's procedure. *Id.* at 6. Plaintiff alleges that Rudas's care was deliberately indifferent because he disregarded that plaintiff was on immunosuppressant drugs and performed the needle aspiration without first stopping those drugs, as a "short cut." *Id.* Plaintiff further alleges that Rudas failed to provide follow-up care. *Id.*

Plaintiff alleges that, on December 23, 2016, Vaughn discontinued an order that plaintiff be provided his meals in his cell (a "cell-feeding chrono") and plaintiff's prescriptions for Gabapentin and morphine sulphate. *Id.* at 7. According to plaintiff, when he asked a nurse why Vaughn had discontinued the chrono and medications, she told him, "Maybe you shouldn't 602 doctors."[1] *Id.*

## II. The Parties' Factual Contentions and Evidence

### A. <u>The Deliberate Indifference Claim</u>

Defendant Rudas has submitted a declaration attesting to the following facts: He has been a physician in good standing since 1978. ECF No. 29-4 at 1-2. He has performed hundreds of surgeries and other procedures, ranging from complex surgeries to "very minor procedures, such as the patellar bursa aspiration that is at issue in this case." *Id.* at 2. He has worked as a physician and surgeon at MCSP since 2010. *Id.*

In September 2016, plaintiff's primary care provider referred him to Rudas for evaluation and treatment of plaintiff's right knee. *Id.* Plaintiff's medical records show that plaintiff had been suffering from a painful and swollen knee for several weeks and that medical staff had told

/////

---

[1] California state prison inmates and staff often refer to prison grievances as "602s" as such grievances are submitted on California Department of Corrections form 602.

him on September 20, 2016, that he was being referred for an appointment to have his right knee evaluated and drained. *Id.* at 2-3; ECF No. 29-6 at 4-16.

Rudas saw plaintiff on September 29, 2016. ECF No. 29-4 at 3. Rudas noted a "'large right knee patellar bursa effusion,' which means fluid had accumulated in the bursa sac in front of [plaintiff]'s knee." *Id.* Based on his medical education and years of practice, and plaintiff's history of rheumatoid arthritis, Rudas believed that "a patellar bursa needle aspiration and steroid injection were appropriate treatments to address [plaintiff]'s condition and relieve his pain." *Id.* Rudas has performed this "minimally invasive" procedure over 200 times in his career. *Id.* at 3, 4.

Rudas explained the procedure to plaintiff. *Id.* at 4. Plaintiff expressed concern that he was on the medication Humira, and Rudas responded that the procedure was not contraindicated by him being on Humira. *Id.* Rudas explained that any medical procedure, including the knee aspiration, carries a risk of infection. *Id.*

A registered nurse prepared plaintiff's knee with Betadine, a topical antiseptic. *Id.* Rudas washed his hands, put on sterile surgical gloves, and injected the anesthetic Lidocaine. *Id.* The needles and syringes used throughout the procedure were taken from unopened, sterile packaging immediately before the procedure. *Id.* The registered nurse cleaned the Lidocaine vial and the steroid solution vial with antiseptic just before Rudas began. *Id.*

After the Lidocaine took effect, Rudas inserted an 18-gauge needle with an attached syringe into the bursa through the area that had been prepared with Betadine. *Id.* Rudas removed about 16 milliliters of bloody, non-clotted fluid from the knee. *Id.* He did not say, "Oh shit, it is blood," as plaintiff claims he did. *Id.* at 5. Rudas then injected 80 milligrams of Kenalog, a steroid, into the bursa. *Id.* at 4. He withdrew the needle and watched the nurse apply a sterile dressing and Ace bandage. *Id.* He told plaintiff to return immediately if he experienced redness or increased tenderness over his right knee. *Id.* at 5; ECF No. 29-6 at 19. Rudas issued a physician's order that plaintiff be seen by his telemedicine rheumatologist within two weeks and that the extracted fluid be sent to a laboratory "to be definitively tested to rule out a bacterial process." ECF No. 29-4 at 5; ECF No. 29-6 at 19.

According to Rudas, no part of the procedure was contraindicated by plaintiff's Humira prescription. ECF No. 29-4 at 5. He declares,

> Humira is a prescription drug that is a tumor necrosis factor inhibitor, also called a "biologic." I have never been advised by the manufacturer of Humira that patients taking this medication should discontinue the medication before undergoing minimally invasive procedures such as the needle aspiration performed in this case. Available safety information for Humira indicates "major surgery" as a possible concern, but not minimally invasive procedures. . . . In my medical career, I have performed minor surgeries or minimally invasive procedures on numerous patients receiving Humira or other similar biologic agents and I have never previously or since seen infectious complications.

*Id.*; *see also* ECF No. 29-6 at 22-27 (Medication Guide for Humira). Rudas submits as an exhibit the United States Food and Drug Administration's Medication Guide for Humira. ECF No. 29-6 at 22-27. The Guide warns that "Humira can lower the ability of your immune system to fight infections. Serious infections have occurred in people taking Humira. These serious infections include tuberculosis and infections caused by viruses, fungi, or bacteria that have spread throughout the body. Some people have died from these infections." *Id.* at 22. It further informs, "After starting Humira, call your doctor right away if you have an infection, or any sign of an infection. Humira can make you more likely to get infections or make any infection that you may have worse." *Id.* Humira is administered by injection under the skin. *Id.* at 24. The guide does not cover protocol for medical procedures like needle aspirations or surgeries, major or minor.

Rudas again saw plaintiff on November 18, 2016 for a staphylococcus infection in his right knee. ECF No. 29-4 at 5. Rudas and plaintiff discussed that it was possible that the infection had been caused by the needle aspiration. *Id.* But it was also possible that the culture performed after the aspiration had resulted in a "false negative" and that the staph infection had already taken hold before the procedure was performed. *Id.* at 5-6.

Plaintiff does not dispute the majority of facts recited by Rudas, with these potentially relevant exceptions. According to plaintiff's declaration, Rudas did not notice "it was a bloody effusion" "until during the aspiration." ECF No. 34 at 113. Plaintiff also claims that he did not consent, orally or in writing, to the procedure. *Id.* at 114. He also asserts that Rudas "reviewed the manufacturer of Humira warning signs for infections and that a patient may be unable to fight new infections." *Id.* Plaintiff concedes that the "Available Safety Information does not even

4

mention minimally invasive procedures," but contends that it "should not have to" because of the other infection warnings. *Id.* Plaintiff testified at his deposition that, during the procedure, Rudas said, "Oh shit. It is blood." ECF No. 30 (Notice of Lodging of Deposition Transcript); Pl.'s Dep. at 111:11-13.

## B. The Retaliation Claim

Defendant Vaughn declares that he has been a physician and surgeon in good standing since 1997. ECF No. 29-5 at 1-2. He's worked as a physician and surgeon at MCSP since 2015. *Id.* at 2. At the time relevant to the complaint, he was plaintiff's primary care physician. *Id.* Vaughn saw plaintiff on December 16, 2016 for a follow-up visit after plaintiff had been released from MCSP's correctional treatment center (where he had been for treatment of the staph infection). *Id.* at 3. Vaughn had no knowledge at that time that plaintiff had filed a grievance against Rudas. *Id.* He had not seen the grievance or been informed of the grievance by anyone, nor did he handle the investigation or response to the grievance. *Id.*

On December 16, 2016, plaintiff was receiving 30 milligrams of morphine sulfate twice daily and 600 milligrams of gabapentin three times per day "for pain associated with his right knee bursitis." *Id.* Vaughn had prescribed 15 milligrams, twice daily, to plaintiff on September 7, 2016 to alleviate pain from the bursitis. *Id.* Another provider increased the dose to 30 milligrams, twice daily, on December 5, 2016. *Id.* According to Vaughn, "[f]or non-cancer pain, morphine and gabapentin are pain medications typically intended for short-term use due to their addictive properties." *Id.*

It was clear to Vaughn on December 16, 2016, that plaintiff's septic bursitis had resolved and that it was therefore time to start weaning him from the morphine and gabapentin. *Id.* He told plaintiff this, and ordered that, 21 days hence, the morphine be tapered to 15 milligrams for a period of seven days, and then discontinued. *Id.* at 4. He also ordered that the gabapentin be reduced over twelve days, consistent with institutional policy and pharmacy protocols. *Id.* Vaughn had previously determined, on December 14, 2016, to begin tapering the morphine after 14 days, but extended that period to 21 days after examining plaintiff on December 16th. *Id.*
/////

Vaughn did not renew plaintiff's cell-feeding chrono when it expired on December 23, 2016, because it was no longer medically-indicated. *Id.* at 4-5. Nurse Iheke had checked with Vaughn that day about the chrono as well as plaintiff's prednisone prescription. *Id.* at 5. Vaughn renewed the prednisone prescription but not the chrono, because cell-feeding orders "are reserved for inmates that cannot physically walk or otherwise transport themselves to the chow line or who require quarantine for a highly contagious transmittable disease." *Id.* Plaintiff's records showed that, on December 16, 2016, he could walk, intermittently using a cane. *Id.*; ECF No. 29-6 at 33. A nurse's note from December 23, 2016 recorded that he was ambulatory and his gait was within normal limits. ECF No. 29-5 at 5; ECF No. 29-6 at 42. If plaintiff had difficulty holding his food tray, inmate assistants in the chow hall could help him. ECF No. 29-5 at 5.

Vaughn saw plaintiff again on January 6, 2017. *Id.* Plaintiff could walk briskly without a cane. *Id.*; ECF No. 29-6 at 47. Vaughn's physical examination of plaintiff showed no need for gabapentin or morphine. ECF No. 29-5 at 5. Vaughn told plaintiff that his request for morphine would be submitted to the institution's pain management committee. *Id.* at 5-6. On January 12, 2017, the pain management committee – which consisted of other medical staff at MCSP – agreed with Vaughn that gabapentin was not indicated for plaintiff's medical condition and that the risks of morphine outweighed the benefits. *Id.*; ECF No. 29-6 at 49.

Vaughn also submits a declaration from E. Hepworth, a Correctional Health Care Services Administrator II at MCSP, who is responsible for supervising the institution's health care grievance office. ECF No. 29-7. In December 2016, inmates at MCSP submitted health care appeals by placing a completed grievance form in a locked box in their building or the program office. *Id.* at 2. A custody sergeant would pick up the appeals between 10 p.m. and 6 a.m. daily and deliver them to the watch office. *Id.* An office technician from the inmate appeals office would then pick them up and deliver any health care appeals to the health care grievance office. *Id.*

Plaintiff dated the appeal as submitted on December 14, 2016. *Id.* at 10. Hepworth's review of the grievance office's computer tracking system shows that the office received plaintiff's grievance against Rudas on December 19, 2016. *Id.* at 2. It was assigned to Dr. C.

Smith, MCSP's chief physician and surgeon, for review on January 5, 2017. *Id.* at 3. This "would have been the first time" Smith had been informed of the grievance, and he would have then informed Rudas. *Id.* Grievance office records show that Rudas was told of the complaint on January 9, 2017. *Id.* "Under CDCR regulations, staff complaints are confidential and the [health care grievance office] would not have notified any other physician aside from the subject of the staff complaint and the assigned reviewer of the staff complaint." *Id.*

Plaintiff contradicts Vaughn's claim that plaintiff no longer needed the morphine after the bursitis resolved, and submits evidence that the medication was for pain from the rheumatoid arthritis, which still existed after the bursitis healed. ECF No. 34 at 73 (note from Dr. Rudas dated November 18, 2016 noting, "The patient is now on extended release morphine to control his bilateral hand arthritic pain. Upon CTC admission, the patient had been on a regimen of [morphine sulphate] 15 mg b.i.d., but the patient states his bilateral hand pain is not being controlled on that dose.") Plaintiff concedes that the gabapentin was for pain from the bursitis. *Id.* at 39.

Plaintiff also disputes Vaughn's claim that he did not know about the grievance against Rudas when he decided to discontinue the medications and cell-feeding chrono. Plaintiff submits his own testimony on this point, claiming that Vaughn said to him on December 16, 2016 that, if dissatisfied with Vaughn's treatment, plaintiff could "file a 602 on that as well." Pl.'s Dep. at 43:22-25. Plaintiff also testified that when he asked a nurse on December 23, 2016 the reason for the discontinuation, she replied, "Maybe you shouldn't 602 doctors." Pl.'s Dep. at 39:8-15. Plaintiff also disputes the evidence submitted by Vaughn that plaintiff was "ambulatory" and his gait was "within normal limits" on December 23rd, because he says has walked with a cane ever since the bursitis and infection. *Id.* at 40. Plaintiff also disputes that he was capable of getting his own food with assistance from helper inmates, arguing that no such helpers existed at MCSP. *Id.* Evidence shows that he needed a cane on December 16, 2016 and February 14, 2017 and that he was still using one on August 18, 2018. *Id.* at 101, 110-11; ECF No. 29-6 at 33.

Plaintiff disputes Vaughn's claim that, by Vaughn's January 6, 2017 examination of plaintiff, plaintiff's right knee injury had resolved and plaintiff no longer needed gabapentin and

morphine. *Id.* at 40. Plaintiff argues that Vaughn gave him a false diagnosis, and that, just one month later, another physician correctly found that plaintiff had chronic right knee pain and swelling, necessitating medication (Tramadol) and a cane. *Id.* at 40, 101-03. However, the same doctor found that, while plaintiff complained of pain, his "physical symptoms are not consistent with rheumatoid arthritis exacerbation" and perhaps came from a torn meniscus or that plaintiff could be "drug seeking." *Id.* at 103; *see also id.* at 101 (noting "no grossly visible signs" of rheumatoid arthritis in the right knee and "normal" x-rays).

Plaintiff speculates that the institutional pain committee agreed with Vaughn only because Dr. Smith served both on the committee and as a reviewer of plaintiff's appeals against Rudas and Vaughn; according to plaintiff, if committee hadn't upheld Vaughn's decision, it would have shown that Smith's grievance determination that Vaughn did not retaliate against plaintiff had been incorrect. *Id.* at 41.

### III.     The Motion for Summary Judgment

#### A.     <u>Summary Judgment Standards</u>

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment avoids unnecessary trials in cases in which the parties do not dispute the facts relevant to the determination of the issues in the case, or in which there is insufficient evidence for a jury to determine those facts in favor of the nonmovant. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-50 (1986); *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471-72 (9th Cir. 1994). At bottom, a summary judgment motion asks whether the evidence presents a sufficient disagreement to require submission to a jury.

The principal purpose of Rule 56 is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Thus, the rule functions to "'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments). Procedurally, under summary

judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). If the moving party meets its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 248; *Auvil v. CBS "60 Minutes"*, 67 F.3d 816, 819 (9th Cir. 1995).

A clear focus on where the burden of proof lies as to the factual issue in question is crucial to summary judgment procedures. Depending on which party bears that burden, the party seeking summary judgment does not necessarily need to submit any evidence of its own. When the opposing party would have the burden of proof on a dispositive issue at trial, the moving party need not produce evidence which negates the opponent's claim. *See, e.g., Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 885 (1990). Rather, the moving party need only point to matters which demonstrate the absence of a genuine material factual issue. *See Celotex*, 477 U.S. at 323-24 ("[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *See id.* at 322. In such a circumstance, summary judgment must be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323.

To defeat summary judgment the opposing party must establish a genuine dispute as to a material issue of fact. This entails two requirements. First, the dispute must be over a fact(s) that is material, i.e., one that makes a difference in the outcome of the case. *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."). Whether a factual dispute is material is

determined by the substantive law applicable for the claim in question.  *Id*.  If the opposing party is unable to produce evidence sufficient to establish a required element of its claim that party fails in opposing summary judgment.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 322.

Second, the dispute must be genuine.  In determining whether a factual dispute is genuine the court must again focus on which party bears the burden of proof on the factual issue in question.  Where the party opposing summary judgment would bear the burden of proof at trial on the factual issue in dispute, that party must produce evidence sufficient to support its factual claim.  Conclusory allegations, unsupported by evidence are insufficient to defeat the motion.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  Rather, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts that show there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249; *Devereaux*, 263 F.3d at 1076.  More significantly, to demonstrate a genuine factual dispute, the evidence relied on by the opposing party must be such that a fair-minded jury "could return a verdict for [him] on the evidence presented."  *Anderson*, 477 U.S. at 248, 252.  Absent any such evidence there simply is no reason for trial.

The court does not determine witness credibility.  It believes the opposing party's evidence, and draws inferences most favorably for the opposing party.  *See id*. at 249, 255; *Matsushita*, 475 U.S. at 587.  Inferences, however, are not drawn out of "thin air," and the proponent must adduce evidence of a factual predicate from which to draw inferences.  *Am. Int'l Group, Inc. v. Am. Int'l Bank*, 926 F.2d 829, 836 (9th Cir. 1991) (Kozinski, J., dissenting) (citing *Celotex*, 477 U.S. at 322).  If reasonable minds could differ on material facts at issue, summary judgment is inappropriate.  *See Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).  On the other hand, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).  In that case, the court must grant summary judgment.

Concurrent with the motion for summary judgment, defendant advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. ECF No. 29-1; *see Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988).

**B.     Analysis**

**1.     Deliberate Indifference Claim Against Rudas**

The Eighth Amendment protects prisoners from inhumane methods of punishment and from inhumane conditions of confinement. *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). Extreme deprivations are required to make out a conditions-of-confinement claim, and only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety." *Johnson v. Lewis*, 217 F.3d 726, 731-32 (9th Cir. 2000) (quotations and citations omitted).

To succeed on an Eighth Amendment claim predicated on allegedly deficient medical care, a plaintiff must establish that: (1) he had a serious medical need and (2) the defendant's response to that need was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A serious medical need exists if the failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain. *Jett*, 439 F.3d at 1096. A deliberately indifferent response may be shown by the denial, delay or intentional interference with medical treatment or by the way in which medical care was provided. *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). To act with deliberate indifference, a prison official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

Thus, a defendant will be liable for violating the Eighth Amendment if he knows that plaintiff faces "a substantial risk of serious harm and disregards that risk by failing to take

reasonable measures to abate it." *Id.* at 847. "[I]t is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842.

Applying those standards here, plaintiff has not raised a triable issue of fact that Rudas knew that the needle aspiration procedure posed a substantial risk of serious harm to plaintiff. Even crediting plaintiff's evidence (that Rudas dismissed plaintiff's concerns about undergoing the procedure while on Humira, did not first consult plaintiff's rheumatologist, did not notice that "it was a bloody effusion" until midway through the procedure, and did not obtain plaintiff's consent to the procedure), plaintiff has not submitted any evidence rebutting Rudas's declaration and exhibits, which show that Rudas believed that a needle aspiration procedure could be safely performed on a patient taking Humira. None of the drug information submitted by either party contradicts Rudas's testimony.[2]

Additionally, Rudas submits evidence that all standard precautions were taken in performing the procedure to minimize the risk of infection. Plaintiff does not dispute that evidence. That Rudas acknowledged later that the procedure may have introduced the infection does not diminish his attempts to limit plaintiff's exposure to infection. Nor does it show that the risk of infection to plaintiff was so high as to render Rudas's decision to perform the aspiration deliberately indifferent.

Lastly, even if Rudas did not get plaintiff's consent to the procedure (a fact that Rudas disputes), plaintiff presents no argument or authority explaining how that lack of consent establishes deliberate indifference. *See Mercaldo v. Fisher*, No. 1:13-CV-1139, 2017 U.S. Dist. LEXIS 14769, at *7-8 (M.D. Pa., Feb. 1, 2017) (noting that "even a negligent failure to obtain fully informed consent" does not violate the Constitution and that, instead, the plaintiff must

---

[2] Rudas objects to plaintiff's Exhibit F, ECF No. 34 at 57-64, which consists of the Wikipedia entry for Adalimumab (another name for Humira). ECF No. 35-2. The objection is sustained (although the court notes that the exhibit is redundant of other evidence and contains nothing that rebuts Rudas's claim that it was not deficient to perform the aspiration on plaintiff due to his Humira prescription). *Badasa v. Mukasey*, 540 F.3d 909, 910 (8th Cir. 2008) (explaining why Wikipedia is unreliable as a source of evidence).

Defendants' additional objections are overruled.

show "that critically important medical information was withheld from him by the doctor with deliberate indifference."). Plaintiff does not dispute that Rudas informed him that the procedure carried a risk of infection, and plaintiff did not refuse the procedure. There is no evidence that Rudas acted with deliberate indifference in connection with informing plaintiff about the procedure.

Neither party's briefs address plaintiff's brief statement in his complaint that Rudas also failed to provide the constitutionally-required minimum of care to him by failing to "follow up." It appears plaintiff has abandoned this claim; in any event, the evidence submitted by the parties negates such a claim. Rudas instructed plaintiff to return immediately if any sign of infection arose, ordered a follow-up exam with plaintiff's rheumatologist for two weeks later, and continued to provide care to plaintiff after plaintiff returned to MCSP after his hospitalization. ECF 29-6 at 29-31. Plaintiff presents no evidence to establish a no triable issue of fact that Rudas did not adequately "follow up."

On the evidence submitted by the parties, a rational fact-finder could not conclude that Rudas knew that the needle aspiration procedure posed an unreasonable risk of serious harm to plaintiff yet proceed in deliberate disregard of that risk. Accordingly, summary judgment should be granted in favor of Rudas.

### 2. Retaliation Claim Against Vaughn

To establish liability for retaliation in violation of the First Amendment, a prisoner must show five elements: (1) that a state actor took some adverse action against him (2) because of (3) his protected conduct, (4) that such action chilled his exercise of his First Amendment rights, and (5) that the action did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005). The plaintiff need not demonstrate that his speech was actually inhibited or suppressed, but merely that the defendant's conduct was such as would chill or silence a person of ordinary firmness from future First Amendment activities. *Id*. at 568-69. Conduct protected by the First Amendment includes communications that are "part of the grievance process." *Brodheim v. Cry*, 584 F.3d 1262, 1271 n.4 (9th Cir. 2009).

/////

Plaintiff has failed to establish a triable issue of fact as to the fifth element of his retaliation claim. Vaughn attests that he discontinued the medications because plaintiff no longer needed them and the risk they presented to plaintiff outweighed its benefits. Plaintiff has submitted no evidence contradicting Vaughn's testimony that, for non-cancer pain, morphine and gabapentin are typically intended for short-term use due to their addictive properties. Whether plaintiff's pain was caused by bursitis or rheumatoid arthritis, plaintiff has not disputed that it was proper to limit the time he was on these medications due to the risks they posed. The institution's pain management committee upheld Vaughn's decision. Moreover, there is no evidence that Vaughn did not address plaintiff's pain; the evidence instead shows that he offered plaintiff alternative medications, which plaintiff refused. ECF No. 29-6 at 47. Plaintiff has therefore failed to raise a triable issue of fact that Vaughn's decision to wean plaintiff from morphine and gabapentin did not further the legitimate correctional goal of treating his condition with medications that did not pose risks of abuse and addiction not outweighed by their benefit to plaintiff. *See Miller v. Cal. Dep't of Corr. & Rehab.*, No. 16-cv-02431-EMC, 2018 U.S. Dist. LEXIS 11716, at *54-56 (N.D. Cal. Jan. 24, 2018).

It is also undisputed that plaintiff could walk with a cane to the chow hall and get his meals after Vaughn declined to renew his cell feeding chrono. Pl.'s Dep. at 56:16-58:2. Plaintiff does not dispute Vaughn's testimony that such orders are "reserved for inmates that cannot physically walk or otherwise transport themselves to the chow line or who require quarantine for a highly contagious transmittable disease." ECF No. 29-5 at 5. Vaughn has therefore submitted unrebutted evidence that he did not renew the chrono in conformity with the institutional policy to limit cell feeding orders because plaintiff did not require in-cell feeding. Accordingly, plaintiff has not demonstrated a genuine dispute over a material issue of fact and the record cannot support his claim that Vaughn's non-renewal of the order did not serve a legitimate correctional goal.

/////
/////
/////
/////

As plaintiff has not raised a triable issue of fact that Vaughn's decisions to wean him from morphine and gabapentin and not to renew his cell feeding chrono did not advance legitimate correctional goals, summary judgment in Vaughn's favor is appropriate.[3]

**IV.     Conclusion and Recommendation**

In accordance with the above, it is RECOMMENDED that defendants' May 17, 2019 motion for summary judgment (ECF No. 29) be granted and that plaintiff's March 1, 2019 motion for settlement conference (ECF No. 26) be denied as moot.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED:  February 12, 2020.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

---

[3] Defendants raise other arguments in favor of summary judgment that, in light of the conclusions above, the court need not address.  If these findings and recommendations are not adopted, the court will address defendants' additional arguments.